Matthew T. Christensen
ANGSTMAN JOHNSON
3649 Lakeharbor Lane
Boise, Idaho 83703
Telephone: (208) 384-8588
Facsimile: (208) 853-0117
Christensen ISB: 7213

Attorneys for Plaintiff/Counterdefendant
Tyson Fresh Meats, Inc.

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br><br>HOLLIFIELD RANCHES, INC.,<br><br>Debtor. | Case No. 10-41613-JDP |
| TYSON FRESH MEATS, INC., a Delaware corporation,<br><br>Plaintiff/Counterdefendant,<br><br>vs.<br><br>HOLLIFIELD RANCHES, INC., an Idaho corporation,<br><br>Defendant/Counterclaimant. | Adversary Case No. 12-08030-JDP<br><br>TYSON FRESH MEATS, INC'S. PRE-TRIAL MEMORANDUM |

Plaintiff/Counterdefendant Tyson Fresh Meats, Inc. ("Tyson"), by and through its counsel of record Angstman Johnson, pursuant to the Court's scheduling order(s), hereby provides the following pre-trial memorandum in the above-referenced adversary proceeding.

TYSON FRESH MEATS, INC'S. PRE-TRIAL MEMORANDUM–PAGE 1
A✦J; Matter: 7081-002

## FACTUAL AND PROCEDURAL BACKGROUND

Hollifield Ranches, Inc. ("HRI") previously operated a cattle operation known as Double H Cattle, Inc. ("Double H"). Double H was in the business of raising cattle for slaughter. Prior to 2010, Double H sold some of the cattle it raised to Tyson. In 2010, Double H and Tyson negotiated and executed a Cattle Feeding Agreement. (The contract is referred to herein as the "Tyson Contract.") Prior to filing its bankruptcy petition, Debtor merged three companies into one. One of those merged companies was Double H. After Debtor filed its bankruptcy petition, it assumed the Tyson Contract with the Court's approval.

The Tyson Contract required Tyson to reimburse Double H (and later HRI) for all procurement, feeding, and grow costs for the cattle raised under the Tyson Contract. Both prior to and subsequent to the assumption of the Tyson Contract by Debtor, Tyson advanced to Double H or HRI, or reimbursed Double H or HRI for, 100% of the procurement, feeding, and growing costs of the cattle raised pursuant to the Tyson contract.

Under the terms of the Tyson Contract, Double H (and later HRI) guaranteed Tyson a $15.00 per head profit on each head of cattle sold under the contract. Additionally, Double H (and later HRI) agreed to pay Tyson interest on the amounts that had previously been reimbursed by Tyson to Double H.

The Tyson Contract stated that Tyson was "responsible for management of market risks through the reasonable and customary use of hedging practices on the cattle placed for feeding" under the Tyson Contract. Nevertheless, Double H (and later HRI) had guaranteed Tyson the $15.00 per head profit on each head of cattle placed under the Tyson Contract. The Tyson Contract further stated that any amounts Double H cattle would be entitled to receive would be calculated according to the examples outlined in the "Settlement and Return on Investment" portion of the Tyson Contract. Based on the Settlement and Return on Investment portion of the

Tyson Contract, Double H (and not Tyson) faced the consequences of the risk management that was performed by Tyson. In other words, while Tyson was responsible for risk management, Double H bore the burdens of whatever risk management was performed.

Prior to signing the Tyson Contract, Tyson informed Double H (through its owner and president, Terry Hollifield) that the risk management performed by Tyson was very conservative, limited solely to hedging the cattle price at the time the cattle were placed into the program. No further hedges were used, nor did Tyson actively trade on the futures market. At that time, Tyson advised Double H to speak with other producers who had programs similar to that proposed between Tyson and Double H, to inquire as to how the risk management in those programs was accomplished. Notwithstanding this warning as to the limits of Tyson's risk management activity, and the advice to contact other producers, Terry Hollifield chose not to contact any other producers and requested that Tyson perform the risk management under the Tyson Contract.

The Tyson Contract allowed Double H (and later HRI) to request different hedging practices from the ones performed by Tyson (i.e., a price hedge at the time of cattle placement), in which case the parties would mutually agree on what hedging practices to undertake. Notwithstanding this allowance in the Tyson Contract, Double H (and later HRI) never requested Tyson perform any other sort of hedging practices from what Tyson had been doing (i.e., hedging the cattle price at the time of cattle placement).

Based on the Settlement and Return on Investment portions of the Tyson Contract, in January 2011 HRI began owing Tyson certain amounts for the lots of cattle placed under the Contract. For the January 2011 billing, HRI paid the amounts owed to Tyson. However, for the February 2011 bill and onward, HRI failed to pay the required amounts to Tyson.

Based on HRI's failure to pay Tyson the amounts owed under the Tyson Contract, the parties rejected the Tyson Contract, which rejection was approved by the Bankruptcy Court. Based on HRI's failure to pay amounts owed, Tyson asserted an administrative claim in the bankruptcy case. This claim was original pursued as a motion (*see* Docket No. 343 in Case No. 10-41613-JDP). However, once HRI asserted a counterclaim against Tyson, the parties agreed to pursue resolution of Tyson's claim through the above-referenced adversary proceeding (*see* Docket Nos. 453 and 454 in Case No. 10-41613-JDP).

HRI asserts, as both a defense to Tyson's claim and as the basis for its counterclaim, that Tyson failed to manage risk through the "reasonable and customary" use of hedging practices. Based on this argument, HRI argues that rather than it owing Tyson the amounts claimed by Tyson, Tyson owed HRI over $1.4 million. HRI does not assert any independent basis for this amount. Rather, it appears HRI claims Tyson is not entitled to the $15.00/head guaranteed profit or the interest charged on the amounts reimbursed by Tyson. Further, HRI apparently claims that the hedging adjustments used by Tyson in calculating its own claim against HRI should, in fact, be paid by Tyson to HRI. Tyson disputes that its risk management was outside the "reasonable and customary use of hedging practices" and that HRI is entitled to any further reimbursement from Tyson.

## LEGAL AUTHORITY AND ARGUMENT

> It is well settled that when a reorganizing debtor assumes an executory contract and thereafter rejects it, all of the liabilities flowing from that rejection are entitled to priority as an administrative expense of the bankruptcy estate. Under §365(g)(2), the rejection of an assumed executory contract or lease constitutes a breach, and that breach is deemed to occur at the time of the rejection.

*In re Widmier*, 03.4 IBCR 234, 235 (Bankr. D. Idaho, 2003) (*citing, among others, Elliott v. Four Seasons Props. (In re Frontier Props., Inc.)*, 979 F.2d 1358 (9th Cir. 1992).

Here, this is exactly the situation we find. Post-petition, Tyson and HRI agreed to assume the Tyson Contract, which the court approved. *See* Docket Nos. 114 and 158 in Case No. 10-41613-JDP. Subsequently, after HRI failed to pay the amounts required by the Tyson Contract, the contract was rejected. *See* Docket Nos. 342 and 451 in Case No. 10-41613-JDP. Consequently, any damages suffered by Tyson as a result of the breach of the Tyson Contract are administrative claims in HRI's bankruptcy case.[1]

The bankruptcy court looks to state law to determine the amount of damages suffered by Tyson as a result of the breach of the Tyson Contract. *See Dunkley v. Rega Properties, Ltd. (In re Rega Properties, Ltd.)*, 894 F.2d 1136 (9th Cir., 1990). So long as the state law is not inconsistent with federal bankruptcy policy, the state law will govern the award of damages. *Id.*; *see also In re Widmier*, 03.4 IBCR at 236.

In Idaho, the elements of a breach of contract claim are clear and long-established. There must be (a) the existence of a contract, (b) the breach of the contract, (c) the breach caused damages, and (d) the amount of those damages. *See, e.g., Mosell Equities, LLC v. Berryhill & Co., Inc.*, ___ Idaho ___, 297 P.3d 232, 241 (2013).

Here, the first two elements are undisputed–the Tyson Contract existed, and HRI failed to make required payments under the terms of the contract. Further, the amount of Tyson's damages (i.e., the amounts that otherwise would be owed from HRI) appears to also be undisputed. What remains in dispute is whether it was HRI's breach of the contract that caused Tyson's damages or whether Tyson breached the contract by failing to act in a reasonable and customary manner. Tyson argues that HRI owed it approximately $958,000.00 based on the formulas outlined in the

---

[1] HRI's confirmed plan has already addressed the treatment of any amount awarded to Tyson as a result of this adversary proceeding, with payments on Tyson's claim being made over the next three years on specified dates.

Tyson Contract and the final closeouts on each lot of cattle (which take into account a myriad of undisputed factors, and the hedging adjustments based on Tyson's hedging activity under the contract). HRI argues, instead, that Tyson owed HRI over $1.4 million, based on Tyson's alleged mismanagement of the risk under the contract.

> In an action for breach of contract, only such damages will be allowed as fairly compensate the injured party for his loss. For breach of contract the laws of damages seeks to place the aggrieved party in the same economic position he would have had if the contract had been performed.

*Gilbert v. City of Caldwell*, 112 Idaho 386, 395, 732 P.2d 355, 364 (Id. Ct. App., 1987) (internal citations omitted). *See also Jenicek v. State Farm Fire and Cas. Co.*, 2004 Ida App. Unpub LEXIS 1, *6-*7 (Id. Ct. App., 2004) ("[T]he measure of damages in an action for breach of contract is the amount necessary to compensate the aggrieved party for the loss suffered as a result of the breach. To recover damages for a breach of contract, the aggrieved party must show that the claimed loss actually resulted from the breach.") (internal citations omitted).

Here, based on the hedging losses sustained on each lot of cattle, Tyson suffered actual damages in the amount of approximately $958,000.00. On the other hand, the damages claimed by HRI are not based on any actual amount paid by HRI to Tyson (or others). Rather, HRI attempts to ignore the terms of the Tyson Contract and claim Tyson is not entitled to certain amounts due it under the contract. Further, HRI ignores the contractual terms that place the consequences of the hedging activity squarely on HRI – not Tyson. HRI's position, with hindsight, is that Tyson should have better anticipated certain changes in the market price for cattle and changed the hedges it had already made on the cattle placed by HRI. Further, HRI makes no argument and presents no proof of the economic position it would have been in had Tyson performed as HRI would have liked. Accordingly, HRI has not proven, and cannot prove at trial, that it is entitled to any damages from Tyson.

**CONCLUSION**

For the foregoing reasons, Tyson is entitled to an administrative claim against HRI in the amount of approximately $958,000.00[2], and HRI is not entitled to any damage award against Tyson.


DATED this 15th day of August, 2013.

>   /s/ Matt Christensen
>   MATTHEW T. CHRISTENSEN
>   Attorney for Plaintiff

---

[2] The specific amount of Tyson's claim will be addressed at trial. Additionally, in the event Tyson is the prevailing party at trial, Tyson intends to assert a claim for attorney fees and costs. *See, e.g., J.D. Heiskell Holdings, LLC, v. Gerratt, et al. (In re Gerratt)*, 11.2 IBCR 65 (Bankr. D. Idaho, 2011); *Idaho Code §12-120*.

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th day of August, 2013, I filed the foregoing document electronically through the CM/ECF system, which caused the following parties to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Brent Taylor Robinson            btr@idlawfirm.com
Noah G. Hillen                   ngh@moffatt.com

Any others as listed on the Court's ECF Notice.

I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participants in the manner indicated:

Sam Johnson, via email (sam@treasurevalleylawyers.com)


                                  /s/  Matt Christensen
                               Matthew T. Christensen