Matthew T. Christensen
ANGSTMAN JOHNSON
3649 N. Lakeharbor Lane
Boise, Idaho 83703
Telephone: (208) 384-8588
Facsimile: (208) 853-0117
Christensen ISB: 7213

Attorney for Plaintiff/Counterdefendant

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| In re: <br><br> HOLLIFIELD RANCHES, INC., <br><br> Debtor. | Case No. 10-41613-JDP |
| TYSON FRESH MEATS, INC., a Delaware corporation, <br><br> Plaintiff/Counterdefendant, <br><br> vs. <br><br> HOLLIFIELD RANCHES, INC., an Idaho corporation, <br><br> Defendant/Counterclaimant. | Adversary Case No. 12-08030-JDP <br><br><br> TYSON FRESH MEATS, INC.'S POST-TRIAL CLOSING ARGUMENT |

Plaintiff/Counterdefendant Tyson Fresh Meats, Inc. ("Tyson"), by and through its counsel of record Angstman Johnson, pursuant to the Court's scheduling orders, hereby submits the following post-trial closing argument in the above-referenced adversary proceeding.

TYSON FRESH MEATS, INC.'S POST-TRIAL CLOSING ARGUMENT – PAGE 1
Matter: 7081-002

**FACTUAL AND PROCEDURAL BACKGROUND**

Hollifield Ranches, Inc. ("HRI") previously operated a cattle operation known as Double H Cattle, Inc. ("Double H"). Double H was in the business of raising cattle for slaughter. Prior to 2010, Double H sold some of the cattle it raised to Tyson. It also sold cattle to other buyers and raised custom cattle for other suppliers. Prior to 2010, with regard to the cattle it raised on its own behalf, Double H would finance its cattle operations through funds received from lenders, which were repaid as the cattle were sold. In early 2010, Double H received indications from its lenders (in particular, KeyBank) that they would no longer be financing Double H's cattle raising operations. At the time, KeyBank had a security interest in virtually all assets held by Double H, including the proceeds from any cattle purchased by Double H.

As a result of its financing problems, in early 2010 Double H approached Tyson about whether Tyson had any programs in which Double H could participate that would help it (Double H) to continue raising cattle. Terry Hollifield, the president of Double H (referred to hereinafter as "Hollifield"), met with Larry Roberts and Brad Brandenburg (both Tyson employees) at the Boise airport to discuss the programs that Tyson had available. During this meeting, Brandenburg discussed Tyson's "Pioneer model" program with Hollifield. Under the Pioneer model, Tyson reimburses suppliers on a monthly basis for the procurement, grow and feed costs of the cattle raised under the program.

Also under the Pioneer model, risk management is performed by either Tyson or the producer/supplier (in this case, Double H). During the airport meeting in early 2010, Brandenburg discussed risk management with Hollifield. Brandenburg explained to Hollifield that, if Double H chose to have Tyson perform risk management under any agreement, Tyson's risk management was conservative and limited to hedging the price of each head of cattle at the time they were placed in the program. Brandenburg explained to Hollifield that Tyson did not

TYSON FRESH MEATS, INC.'S POST-TRIAL CLOSING ARGUMENT – PAGE 2
Matter: 7081-002

regularly engage in further risk management activities such as purchasing call or put options. Additionally, at this same meeting, Brandenburg gave Hollifield the names of other suppliers who were also on the Pioneer model with Tyson and encouraged Hollifield to discuss the program with those suppliers, including the risk management aspects of the program. Hollifield never contacted any of those suppliers prior to signing an agreement with Tyson.

Notwithstanding the limits on the risk management that Tyson performed, Double H asked that Tyson perform the risk management of cattle prices. Double H did this in order to take those responsibilities off of Hollifield and allow him to focus on other significant events affecting Double H (such as the impending bankruptcy).

Prior to executing any feeding contract with Tyson, Double H had performed its own price risk management on the cattle it grew. This risk management included the use of hedging, purchasing call options, and purchasing put options. In addition, Double H had sold cattle on fixed-price contracts, including at least one fixed-price contract with Tyson.

In May/June 2010, after the Boise airport meeting, Double H and Tyson negotiated and executed a Cattle Feeding Agreement. (The contract is referred to herein as the "Tyson Contract.") The Tyson Contract is clear and unambiguous. It required Tyson to advance or reimburse Double H for all procurement, grow and feeding costs for the cattle raised under the Tyson Contract. Double H selected all of the cattle and placed them into the program. Tyson reimbursed Double H for the procurement costs of these cattle. Double H then made all decisions related to feeding and caring for the cattle, and Tyson advanced or reimbursed Double H for the costs of feeding and growing the cattle.

Throughout the term of the contract, Tyson advanced to Double H, or reimbursed Double H for, 100% of the procurement, grow and feed costs of the cattle raised pursuant to the Tyson

TYSON FRESH MEATS, INC.'S POST-TRIAL CLOSING ARGUMENT – PAGE 3
Matter: 7081-002

Contract. Upon delivery of the cattle for slaughter, the procurement, grow and feed costs underwent a final calculation prior to any final payment for the cattle (which calculation was still subject to further adjustments as described herein).

The Tyson Contract clearly states that Tyson was due interest from Double H for all funds reimbursed by Tyson (i.e., procurement and grow/feed costs). The Tyson Contract also clearly and unambiguously states that Double H guaranteed Tyson a fixed profit of $15.00 per head of cattle killed under the Tyson Contract. Because Double H was unable to continue to borrow money from its lenders to continue its cattle operation, the Tyson Contract allowed Double H to fill its feedlot with cattle as it headed into bankruptcy.

Just prior to filing a bankruptcy petition, Double H was merged with Hollifield Ranches, Inc. ("HRI").[1] HRI then filed a Chapter 11 bankruptcy petition on or about September 9, 2010, which is the underlying case associated with this adversary proceeding. After HRI filed its bankruptcy petition, it (together with Tyson) sought court approval to assume the Tyson Contract (*see Docket No. 114 filed in Case No. 10-41613-JDP on November 12, 2010*). In this motion, HRI argued that it was in its best interest to assume the Tyson Contract due to anticipated future profits for HRI. After a hearing held in December 2010, in which HRI continued to argue that the Tyson Contract would be beneficial, the court approved the assumption of the Tyson Contract. (*See Docket No. 158 filed in Case No. 10-41613-JDP on December 27, 2010*). HRI later rejected the Tyson Contract, and its termination was approved by the court in March 2012. (*See Docket No. 451 filed in Case No. 10-41613-JDP on March 16, 2012.*)

Thus, by its clear and unambiguous terms, the Tyson Contract requires Tyson to compensate Double H for the procurement, grow and feed costs, requires Double H to

---

[1] For ease of reference, the cattle operation is referred to herein as "Double H", whether it refers to pre- or post-petition activity. This is also done to differentiate the cattle operation from Hollifield personally.

TYSON FRESH MEATS, INC.'S POST-TRIAL CLOSING ARGUMENT – PAGE 4
Matter: 7081-002

compensate Tyson for interest charges on the procurement grow and feed costs, guarantees Tyson a $15/head profit, and requires Double H to compensate Tyson if the hedging adjustments resulted in a negative net profit. Based on the terms of the Tyson Contract, Tyson claims losses related to the following lots of cattle: Lot 735, 743, 745, 751, 773, 840, 836, 791, 790, 793, 814, 818, 828, 852, 767, 777, 779, 783, 785, 787, 846, 753, 789, 830, 850, 799, 795, 797, 801, 803, 844, 854, 856, 858, 862, 866, 860, and 864 (the "Tyson Claim Lots").

The Tyson Contract required Tyson to manage the market risks of the cattle prices "through the reasonable and customary use of hedging practices on the cattle" placed for feeding under the Tyson Contract. Double H admitted at trial that it was responsible for risk management of all procurement, grow and feed costs for the cattle fed under the Tyson Contract. Notwithstanding the fact that Tyson was contractually obligated to perform the management of market risks on the ultimate cattle price, Double H bore the burden of the consequences of the management of market risks. As outlined in the "Settlement and Return on Investment" portion of the Tyson Contract, Double H was either paid, or paid Tyson, based on the outcome of any hedging activity.

When each lot of cattle was placed under the Tyson Contract, Double H would provide Tyson with a breakeven calculation analysis for each lot. Trial Exhibits 112-149 contain, among other things, the breakeven calculations provided to Tyson by Double H for the Tyson Claim Lots. The breakeven calculations provided by Double H calculated what the projected sale price of the cattle would have to be, and included Double H's procurement costs, projected grow and feed costs, as well as the interest and guaranteed profit due to Tyson, and built-in profit for Double H. In other words, so long as Double H met its breakeven projections by controlling the procurement, grow and feed costs of the cattle, there would be profit paid to Double H. When

TYSON FRESH MEATS, INC.'S POST-TRIAL CLOSING ARGUMENT – PAGE 5
Matter: 7081-002

each lot of cattle was placed under this agreement, Tyson hedged the sale price of the cattle based on the breakeven calculations provided by Double H.  Each and every head of cattle placed under the Tyson Contract was hedged by Tyson.

The purpose of hedging a head of cattle (and the reason the parties required that Tyson hedge the cattle under the Tyson Contract) is to protect against downturns in the final market price of the cattle by "locking-in" the sale price of the cattle at the time they are placed.  If the final market price of the cattle at the time of slaughter goes down, the supplier still gets the benefit of the locked-in price and the projected profit if costs are as projected by the supplier.  On the other hand, if the final market price of the cattle at the time of slaughter goes up, the supplier still gets the benefit of the locked-in price.  The cost of closing out the hedge is offset by the increase in the market price.  In other words, so long as the costs are controlled by the supplier so they do not exceed the projections, market fluctuations will not affect overall projected profit for the supplier.

During the latter part of the relationship between Tyson and Double H under the Tyson Agreement, the market price of the cattle sold at slaughter was increasing.  The hedged price during this same time period also increased.  As Trial Exhibit 151 shows, while the market price (the "closing price" on Exhibit 151) was going up, the hedged price (the "deal price" on Exhibit 151) also was going up.

Any difference in the hedged price ("deal price", on Exhibit 151) and closing price at the time of slaughter resulted in a "hedging adjustment."  The hedging adjustment was positive if the closing price was lower than the hedged price, resulting in a hedging gain.  The hedging adjustment was negative if the closing price was higher than the hedged price, resulting in a

hedging loss. If a hedging gain resulted, it usually meant funds were paid <u>to</u> Double H by Tyson. This sort of hedging gain, in fact, occurred during the early periods of the Tyson Contract.

The hedging adjustments for each hedge were calculated on a weekly basis. However, the cattle from each of the Tyson Claim Lots were killed in multiple calendar weeks per lot. Consequently, the various hedging adjustments had to be allocated from a weekly basis, to each lot based on the number of head killed from that lot in any given week. Trial Exhibits 154 and 155 depict the hedging adjustments per week and allocate the weekly hedging adjustments to the Tyson Claim Lots.

Trial Exhibit 157 shows the net profit/loss for each of the Tyson Claim Lots, and includes all of the relevant data regarding procurement/grow/feed costs, interest charges, guaranteed profits, and hedging adjustments. Based on each category of information and the terms of the Tyson Contract, Tyson claims that Double H owes it $958,442.43.

Double H, on the other hand, argues that it is excused from paying this amount to Tyson based on Tyson's failure to manage the price risk of the cattle in a customary and reasonable manner. In fact, not only does Double H claim it owes Tyson nothing, Double H claimed that Tyson owed it approximately $678,387.10 – the amount that Double H allegedly would have been paid had Tyson managed the risk in a reasonable and customary manner.

When managing cattle risk, there are two categories of risk that must be managed: price risk and basis risk. Customary ways of managing *price* risk include short and long hedging (in the case of a supplier – short hedging), purchasing call options, and purchasing put options. Customary ways of managing *basis* risk on cattle are limited to selling the cattle on a fixed price contract and purchasing a basis contract.

TYSON FRESH MEATS, INC.'S POST-TRIAL CLOSING ARGUMENT – PAGE 7
Matter: 7081-002

With regard to basis risk, Double H never requested a basis contract between itself and Tyson for any of the cattle placed pursuant to the Tyson Contract.  Additionally, Double H did not request a fixed price contract on any of the cattle placed pursuant to the Tyson Contract.  Thus, no basis risk was managed by either Tyson or Double H.  Nevertheless, there was not significant basis risk during that time period.  As testified by Dr. James Mintert at trial, the fluctuations in basis during the relevant time period were normal market fluctuations in basis – not something abnormal that needed aggressive basis risk action.

Under the terms of the Tyson Contract, Double H had the ability to request information from Tyson on what hedging practices were being pursued, and to request different practices, if Double H so desired.  Indeed, during the time period that Tyson was hedging cattle, it provided a weekly report to Double H showing the hedging activity.  This report was substantially in the same form as Exhibit 151 and depicted the deal and closing price for each hedge that was placed.  However, it appears that Double H was not sufficiently monitoring the hedging activity performed by Tyson.  Prior to January 2011 (in other words, over nine months after the first head of cattle were placed by Double H), Double H did not inquire of Tyson what hedging practices it was pursuing regarding the cattle lots placed by Double H under the Tyson Contract.  Additionally, Double H never requested Tyson perform any different hedging practices from what Tyson was already doing.

As discussed above, the purpose of hedging the price of cattle is to protect from losses caused by the market price of cattle decreasing.  In the event the market price of cattle increases, there are essentially three options:  first, the supplier could liquidate the previous hedge position and simply ride out the market (in other words, no risk management in place at all); second, the supplier could keep the current hedged position and purchase a call option, which provided

protection up to a higher market price than the previously-hedged price; last, the supplier could liquidate the previous hedge position and purchase a put option.

Under any of these options, there are specific hard costs that are incurred by the supplier. To liquidate the hedge, the supplier must pay the long-hedger (i.e., the opposite party on the hedge position), whatever price is required to liquidate the hedge. Call and put options both require premiums be paid in order to purchase the option. Thus, if the market price goes up and the supplier wants to change its position, under any of these scenarios that supplier is going to lock in a certain amount of losses – i.e., the release and/or premium price. Thus, the market price must go up sufficiently to cover whatever that locked-in loss occurred and remain at that higher level for the change in position to be actually reasonable.

Despite being aware of the hedging activity performed by Tyson and Tyson's stated position that it only hedged prices and did not engage in more aggressive activity, and despite being aware of the market conditions and the hedging impact on the potential profits, Double H never requested that Tyson liquidate previously-hedged positions or purchase a call or put option. As Tyson employees testified, had Double H requested that activity, Tyson would have performed it. (Of course, Double H would have then been responsible for the additional prices incurred, which it likely could not have paid, based on the ongoing bankruptcy case and continued scrutiny by Double H's bankruptcy creditors.)

The Tyson Contract required Double H to pay Tyson if the hedging adjustments were not sufficiently offset by the market price of the cattle at the time of slaughter. For the Tyson Claim Lots, Double H has not paid Tyson any amount. The crux of the parties' dispute is not whether Double H has paid Tyson required amounts, but whether or not Tyson managed the market risks in a customary and reasonable manner.

TYSON FRESH MEATS, INC.'S POST-TRIAL CLOSING ARGUMENT – PAGE 9
Matter: 7081-002

At trial, the Court heard testimony from two witnesses characterized as experts. The first witness who provided expert testimony was Terry Hollifield. As stated at trial, Hollifield was qualified to testify as an expert witness as to the risk management that had previously been performed related to Double H's own cattle operation. Hollifield was not qualified, and did not testify, as an expert in cattle risk management generally or the industry standards of what sort of risk management is customary and reasonable. However, Double H conceded at trial that the applicable standard for Tyson's conduct is what is customary and reasonable within the entire cattle market, not simply Double H's cattle operation. Accordingly, Hollifield's testimony regarding what is customary and reasonable risk management practices should be given little weight by the Court. Hollifield simply does not have sufficient experience or knowledge and was not qualified as an expert regarding the cattle industry as a whole.

The second expert who provided testimony was Dr. James Mintert, presented by Tyson. Dr. Mintert was qualified and testified as an expert on cattle risk management throughout the cattle industry. Dr. Mintert testified regarding the various tools available for price risk management in the cattle industry, including hedging, purchasing put or call options, fixed-price contracts, and basis contracts. Dr. Mintert further testified regarding the customary and reasonable risk management techniques used within the cattle industry as a whole. Dr. Mintert's testimony was supported by his experience in this field, as well as his investigation into the specific facts of this case.

Dr. Mintert specifically testified that Tyson's risk management techniques used here were reasonable and customary within the cattle industry. Double H failed to refute Dr. Mintert's testimony and presented no expert testimony of cattle risk management in the industry as a whole.

## LEGAL AUTHORITY AND ARGUMENT

1. **Tyson is Entitled to an Administrative Claim Based on Double H's Breach of Contract.**

   > It is well settled that when a reorganizing debtor assumes an executory contract and thereafter rejects it, all of the liabilities flowing from that rejection are entitled to priority as an administrative expense of the bankruptcy estate. Under §365(g)(2), the rejection of an assumed executory contract or lease constitutes a breach, and that breach is deemed to occur at the time of the rejection.

*In re Widmier*, 03.4 IBCR 234, 235 (Bankr. D. Idaho, 2003) (*citing, among others, Elliott v. Four Seasons Props. (In re Frontier Props., Inc.)*, 979 F.2d 1358 (9th Cir. 1992).

Here, this is exactly the situation we find. Post-petition, Tyson and HRI agreed to assume the Tyson Contract, which the court approved. *See* Docket Nos. 114 and 158 in Case No. 10-41613-JDP. Subsequently, after HRI failed to pay the amounts required by the Tyson Contract, the contract was rejected. *See* Docket Nos. 342 and 451 in Case No. 10-41613-JDP. Consequently, any damages suffered by Tyson as a result of the breach of the Tyson Contract are administrative claims in HRI's bankruptcy case.[2]

The ultimate issues are whether Double H breached the contract and whether Double H has an excuse for breaking the contract. In Idaho, the elements of a breach of contract claim are clear and long-established. There must be (a) the existence of a contract, (b) the breach of the contract, (c) the breach caused a loss, and (d) the amount of those damages. *See, e.g., Mosell Equities, LLC v. Berryhill & Co., Inc.*, ___ Idaho ___, 297 P.3d 232, 241 (2013).

Here, the first two elements are essentially undisputed. The parties agree that the Tyson Contract existed. Further, the parties agree that the terms of the Tyson Contract required Double H to pay Tyson under certain circumstances and that Double H has not paid Tyson what Tyson

---

[2] HRI's confirmed plan has already addressed the treatment of any amount awarded to Tyson as a result of this adversary proceeding, with payments on Tyson's claim being made over the next three years on specified dates.

TYSON FRESH MEATS, INC.'S POST-TRIAL CLOSING ARGUMENT – PAGE 11
Matter: 7081-002

claims is due.  Additionally, the amount of Tyson's claimed damages is not in dispute, nor is it really disputed that Double H's actions caused Tyson's loss.  In other words, Double H does not reasonably dispute that Tyson proved the material elements of a breach of contract claim.

Rather, the heart of this dispute is whether Double H was excused from performing its obligations under the Tyson Contract based on Tyson's alleged failure to manage market risk in a customary and reasonable manner.  A resolution of this issue requires evidence of what sort of risk management is customary and reasonable within the cattle market as a whole – not simply within Double H's history of operation.  The only evidence that Double H presented at trial on this issue was the testimony of Terry Hollifield, who only testified regarding Double H's own cattle operation.  Hollifield was not qualified, and did not testify, as someone with knowledge of what is customary and reasonable within the cattle market as a whole.  Accordingly, his testimony should be given very little weight when the Court is searching for the standard of customary and reasonable actions within the general cattle market.

On the other hand, Tyson presented two witnesses who testified about cattle risk management.  The first was Dwight Bibbs, Tyson's own Vice-President of Meats Risk Management and Procurement.  Mr. Bibbs testified to the type of risk management that Tyson regularly performs and shared factual testimony regarding risk management in general.  More importantly, Tyson presented testimony from Dr. James Mintert, a Purdue professor who was qualified and testified as an expert witness on cattle risk management within the general cattle market.  Dr. Mintert specifically testified that the sort of risk management performed by Tyson (i.e., hedging each head of cattle when they were placed, without any further risk management activity) was both customary and reasonable within the cattle market.  As Dr. Mintert explained, this sort of action is customary as it is done by a myriad of other cattle producers and purchasers.  Additionally, it is reasonable because, among other things, the larger cattle companies have survived as long as they have by performing exactly this type of conservative risk management.

Double H never refuted Dr. Mintert's testimony at trial. Based on Dr. Mintert's experience and investigation into this matter, his testimony at trial was credible and was the only source of evidence as to the standards of what was customary and reasonable within the cattle market as a whole. In Dr. Mintert's expert opinion, Tyson's risk management activity in this case was customary and reasonable.

Based on the fact that Tyson paid 100% of the reimbursement costs to Double H, and performed the risk management in a customary and reasonable manner, Tyson did not breach any portion of the Tyson Contract. Accordingly, Double H does not have an excuse for failing to perform its own obligations under the contract.

The bankruptcy court looks to state law to determine the amount of damages suffered by Tyson as a result of Double H's breach of the Tyson Contract. *See Dunkley v. Rega Properties, Ltd. (In re Rega Properties, Ltd.)*, 894 F.2d 1136 (9th Cir., 1990). So long as the state law is not inconsistent with federal bankruptcy policy, the state law will govern the award of damages. *Id.*; *see also In re Widmier*, 03.4 IBCR at 236.

> In an action for breach of contract, only such damages will be allowed as fairly compensate the injured party for his loss. For breach of contract the laws of damages seeks to place the aggrieved party in the same economic position he would have had if the contract had been performed.

*Gilbert v. City of Caldwell*, 112 Idaho 386, 395, 732 P.2d 355, 364 (Id. Ct. App., 1987) (internal citations omitted). *See also Jenicek v. State Farm Fire and Cas. Co.*, 2004 Ida App. Unpub LEXIS 1, *6-*7 (Id. Ct. App., 2004) ("[T]he measure of damages in an action for breach of contract is the amount necessary to compensate the aggrieved party for the loss suffered as a result of the breach. To recover damages for a breach of contract, the aggrieved party must show that the claimed loss actually resulted from the breach.") (internal citations omitted).

Here, absent Double H's breach of the contract, Tyson would have been paid $958,442.43 by Double H. Tyson present compelling and unrebutted calculations of its damages

TYSON FRESH MEATS, INC.'S POST-TRIAL CLOSING ARGUMENT – PAGE 13
Matter: 7081-002

at trial, which were tied to the various reimbursements and other contractual guarantees made by Double H. Accordingly, Tyson is entitled to an administrative claim in the HRI bankruptcy case in the amount of $958,442.43, payable pursuant to the confirmed Chapter 11 Plan.

### 2. **Double H is Not Entitled to Any Relief on Its Counterclaim.**

In its counterclaim, Double H alleges that it is entitled to at least $678,387.10 based on Tyson's failure to manage market risk in a customary and reasonable manner. For at least two reasons, Double H is not entitled to any relief on its counterclaim. First, as argued above, Tyson acted in a customary and reasonable manner and did not breach any portion of the Tyson Contract. Accordingly, to the extent Double H seeks a recovery based on Tyson's own breach, Double H is not entitled to that relief.

Secondly, Double H apparently seeks a damage award against Tyson under the belief that Double H should have received the full benefit of the increased market price for the cattle which occurred during the relevant period. At the same time, Double H argues that Tyson was responsible to manage all market risk. Double H now seeks the benefit, through a judgment against Tyson, of having no risk management in place at all. Rather, Double H has now seen (in hindsight) the increased market value of the cattle and wants to take advantage of that increase without acknowledging the benefits and risks of the risk management performed by Tyson (at Double H's request and with Double H's knowledge). In other words, Double H incongruously wants both aggressive risk management and the benefits of having no risk management at all. This demonstrates a misunderstanding of the purpose for risk management in the first place. By hedging all of the cattle, at the breakeven calculations provided by Double H, Tyson locked in a profit for Double H – assuming Double H could meet its breakeven calculations. The true problem in this case was not caused by Tyson's risk management – it was Double H's failure to control its own costs and meet its own projected breakeven calculations.

TYSON FRESH MEATS, INC.'S POST-TRIAL CLOSING ARGUMENT – PAGE 14
Matter: 7081-002

A quick review of Exhibit 157 reveals this as the root of Double H's difficulties.  Exhibit 157 shows the procurement, grow and feed costs that were reimbursed by Tyson for each lot of cattle placed.  It also shows the net sale price for each lot.  This net sale price (found in the "Net Sale Price") column was the market price paid for the cattle when they were killed (less the shipping costs of getting the cattle from Hansen, Idaho, to Pasco, Washington).  Recall, the breakeven projections provided by Double H included the procurement costs, grow and feed costs, interest payable to Tyson, $15/head payable to Tyson, and a profit for Double H.  As Exhibit 157 shows, even just accounting for the procurement, grow and feed costs (i.e., not counting the interest charges, guaranteed profit to Tyson, or calculated profit to Double H), the net sale price for the lots shown on Exhibit 157 was negative $45,637.82.  In other words, Double H was losing money on the procurement, grow and feed costs, which it had 100% control over, and 100% responsibility for managing.  Had Double H been growing the cattle at the projected costs, the increased market price of cattle would have shown much higher returns (which would have then been offset by the hedging adjustments based on the hedging activity).  The problem here was not Tyson's hedging practices.  The underlying cause of Double H's breach of the contract was Double H's own failure to meet its projected breakeven calculations (or, a failure to accurately calculate the breakeven analysis in the first place).

Additionally, as argued during the trial, Double H's damage calculations fail to take into account the lots for which Tyson already paid Double H and fails to account for the lots that Hollifield admitted were hedged in a customary and reasonable manner.  Absent these specific calculations, Double H is not entitled to any damages.

Thus, for at least three reasons, Double H is not entitled to any relief on its counterclaim, and the Court should deny the counterclaim.

TYSON FRESH MEATS, INC.'S POST-TRIAL CLOSING ARGUMENT – PAGE 15
Matter: 7081-002

**CONCLUSION**

The Tyson Contract was breached, and Tyson suffered damages as a result. The breach of the contract was not caused by Tyson's failure to manage market risks. Rather, the breach was caused by Double H's own failure to accurately project or meet its breakeven analysis and control the costs of raising the cattle. For the foregoing reasons, Tyson is entitled to an administrative claim against HRI in the amount of $958,442.43[3], and HRI is not entitled to any damage award against Tyson.

DATED this 20th day of September, 2013.

/s/ Matt Christensen
MATTHEW T. CHRISTENSEN
Attorney for Plaintiff/Counterdefendant

---

[3] Additionally, in the event Tyson is the prevailing party at trial, Tyson intends to assert a claim for attorney fees and costs. *See, e.g., J.D. Heiskell Holdings, LLC, v. Gerratt, et al. (In re Gerratt)*, 11.2 IBCR 65 (Bankr. D. Idaho, 2011); *Idaho Code § 12-120*.

CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on this 20th day of September, 2013, I filed the foregoing document electronically through the CM/ECF system, which caused the following parties to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

| | |
|---|---|
| Matthew T. Christensen | mtc@angstman.com |
| Brent Taylor Robinson | btr@idlawfirm.com |
| Noah G. Hillen | ngh@moffatt.com |
| Sam Johnson | sam@treasurevalleylawyers.com |

Any others as listed on the Court's ECF Notice.

            /s/   Matt Christensen
    Matthew T. Christensen