Matthew T. Christensen
ANGSTMAN JOHNSON
3649 N. Lakeharbor Lane
Boise, Idaho 83703
Telephone: (208) 384-8588
Facsimile:  (208) 853-0117
Christensen ISB: 7213

Attorneys for Plaintiff/Counterdefendant

UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br><br>　　HOLLIFIELD RANCHES, INC.,<br><br>　　　　Debtor. | Case No. 10-41613-JDP |
| TYSON FRESH MEATS, INC., a Delaware corporation,<br><br>　　　　Plaintiff/Counterdefendant,<br><br>vs.<br><br>HOLLIFIELD RANCHES, INC., an Idaho corporation,<br><br>　　　　Defendant/Counterclaimant. | Adversary Case No. 12-08030-JDP<br><br>TYSON FRESH MEATS, INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW |

Plaintiff/Counterdefendant Tyson Fresh Meats, Inc. ("Tyson"), by and through its counsel of record Angstman Johnson, pursuant to the Court's post-trial order, hereby submits the following proposed Findings of Fact and Conclusions of Law.

**PROPOSED FINDINGS OF FACT**

If a finding of fact is, or should be, a conclusion of law, such finding shall be deemed to also be a conclusion of law.

1. Hollifield Ranches, Inc. ("HRI") previously operated a cattle operation known as Double H Cattle, Inc. ("Double H").

2. Double H was in the business of raising cattle for slaughter. Prior to 2010, Double H sold some of the cattle it raised to Tyson. It also sold cattle to other buyers and raised custom cattle for other suppliers.

3. Prior to 2010, with regard to the cattle it raised on its own behalf, Double H would finance its cattle operations through funds received from lenders, which were repaid as the cattle were sold.

4. In early 2010, Double H received indications from its lenders (in particular, KeyBank) that they would no longer be financing Double H's cattle raising operations. At the time, KeyBank had a security interest in virtually all assets held by Double H, including the proceeds from any cattle purchased by Double H.

5. In early 2010, Double H approached Tyson about whether Tyson had any programs in which Double H could participate that would help it (Double H) to continue raising cattle.

6. Terry Hollifield, the president of Double H (referred to hereinafter as "Hollifield"), met with Larry Roberts and Brad Brandenburg at the Boise airport to discuss the programs that Tyson had available.

7. During this meeting, Brandenburg discussed Tyson's "Pioneer model" program with Hollifield. Under the Pioneer model, Tyson advances and/or reimburses suppliers on a monthly basis for the procurement, grow, and feed costs of the cattle raised under the program.

8. Also under the Pioneer model, risk management is performed by either Tyson or the producer/supplier (in this case, Double H).

9. During the airport meeting in early 2010, Brandenburg discussed risk management with Hollifield. Brandenburg explained to Hollifield that, if Double H chose to have Tyson perform risk management under any agreement, Tyson's risk management was conservative and limited to hedging the price of each head of cattle at the time they were placed in the program. Brandenburg explained to Hollifield that Tyson did not regularly engage in further risk management activities such as purchasing call or put options.

10. At this same meeting, Brandenburg provided Hollifield with the names of other suppliers who were also using the Pioneer model with Tyson and encouraged Hollifield to discuss the program with those suppliers, including the risk management aspects of the program. Notwithstanding this invitation, Hollifield never contacted these suppliers prior to signing a contract with Tyson.

11. Notwithstanding the limits on the risk management that Tyson performed, Double H asked that Tyson perform the risk management of cattle prices. Double H did this in order to take those responsibilities off of Hollifield and allow him to focus on other significant events affecting Double H (such as the impending bankruptcy).

12. Prior to executing any feeding contract with Tyson, Double H had performed its own price risk management on the cattle it grew. This risk management included the use of hedging, purchasing call options, and purchasing put options.

13. In addition, Double H had sold cattle on fixed-price contracts, including at least one fixed-price contract with Tyson.

14. In May/June 2010, Double H and Tyson negotiated and executed a written Cattle Feeding Agreement. (The contract is referred to herein as the "Tyson Contract.") Prior to this date, Double H and Tyson had been operating on a simple oral agreement.

15. The Tyson Contract is clear and unambiguous and required Tyson to advance or reimburse Double H for all procurement, feeding, and grow costs for the cattle raised under the Tyson Contract.

16. Double H selected cattle and placed them into the program under the Tyson Contract. Tyson reimbursed Double H for the costs of procuring the cattle under the Tyson Contract.

17. Double H then made all decisions related to feeding and caring for the cattle under the Tyson Contract, and Tyson advanced or reimbursed costs for feeding and growing the cattle.

18. Upon delivery of the cattle for slaughter, the procurement, feed and grow costs underwent a final calculation prior to any final payment for the cattle (which was also subject to further adjustments as explained herein).

19. The Tyson Contract clearly and unambiguously states that Tyson was due interest from Double H for all funds reimbursed by Tyson (i.e., procurement and feed/grow costs).

20. In the Tyson Contract, Double H clearly and unambiguously guarantees Tyson a fixed profit of $15.00 per head of cattle killed under the Tyson Contract.

21. Without the continued ability to borrow funds from its lenders, the Tyson Contract allowed Double H to fill its feedlot with cattle while it headed into bankruptcy.

22. Just prior to filing a bankruptcy petition, Double H was merged with Hollifield Ranches, Inc. ("HRI").[1] HRI then filed a Chapter 11 bankruptcy petition on or about September 9, 2010, which is the underlying case associated with this adversary proceeding.

23. After HRI filed its bankruptcy petition, it (together with Tyson) sought court approval to assume the Tyson Contract (*see Docket No. 114 filed in Case No. 10-41613-JDP on November 12, 2010*). In this motion, HRI argued that it was in its best interest to assume the Tyson Contract due to anticipated future profits for HRI.

24. After a hearing held in December 2010 in which HRI continued to argue that the Tyson Contract would be beneficial, the court approved the assumption of the Tyson Contract. (*See Docket No. 158 filed in Case No. 10-41613-JDP on December 27, 2010.*) HRI later rejected the Tyson Contract, and its termination was approved by the court in March 2012. (*See Docket No. 451 filed in Case No. 10-41613-JDP on March 16, 2012.*)

25. Tyson claims losses related to the following lots of cattle: Lot 735, 743, 745, 751, 773, 840, 836, 791, 790, 793, 814, 818, 828, 852, 767, 777, 779, 783, 785, 787, 846, 753, 789, 830, 850, 799, 795, 797, 801, 803, 844, 854, 856, 858, 862, 866, 860, and 864 (the "Tyson Claim Lots").

26. Trial Exhibit 157 accurately depicts the following information for each of the Tyson Claim Lots: number of head of cattle, amounts previously reimbursed by Tyson, market priced of the cattle in each lot at the time of slaughter, pre-adjustment net profit/loss to Double H, guaranteed profit to Tyson, and interest owed to Tyson by Double H.

27. The Court finds that each of the Tyson Claim Lots had the following Net Profit/Loss prior to any adjustment for hedging practices:

---

[1] For ease of reference, the cattle operation is referred to herein as "Double H", whether it refers to pre- or post-petition activity. This is also done to differentiate the cattle operation from Hollifield personally.

| Lot Number | Net Profit/Loss (before hedging adjustment) |
|---|---|
| 735 | $9,588.44 |
| 743 | ($1,174.23) |
| 745 | $2,935.93 |
| 751 | ($2,342.23) |
| 773 | ($27,156.93) |
| 840 | ($9,748.12) |
| 836 | ($14,757.71) |
| 791 | ($5,215.37) |
| 790 | ($8,249.93) |
| 793 | ($659.09) |
| 814 | $1,126.47 |
| 818 | $2,931.61 |
| 828 | ($4,031.56) |
| 852 | ($10,753.71) |
| 767 | ($14,019.00) |
| 777 | ($7,570.41) |
| 779 | ($423.99) |
| 783 | ($2,219.46) |
| 785 | ($9,838.80) |
| 787 | ($2,508.51) |
| 846 | ($8,163.82) |
| 753 | ($17,588.10) |
| 789 | ($16,370.23) |
| 830 | $856.59 |
| 850 | $1,755.09 |
| 799 | ($14,084.11) |
| 795 | ($4,670.18) |
| 797 | ($4,072.95) |
| 801 | ($10,951.30) |
| 803 | ($6,953.35) |
| 844 | ($2,709.08) |
| 854 | ($4,200.18) |
| 856 | ($1,559.30) |
| 858 | ($3,062.72) |
| 862 | $1,158.38 |
| 866 | ($8,311.54) |
| 860 | ($6,811.89) |
| 864 | ($5,363.21) |
| **TOTAL** | **($215,188.50)** |

28. The Tyson Contract clearly and unambiguously required Tyson to manage the market risks of the cattle prices "through the reasonable and customary use of hedging practices on the cattle" placed for feeding under the Tyson Contract.

29. Double H admitted at trial that it was responsible for risk management of all procurement, feed, and grow costs for the cattle fed under the Tyson Contract.

30. The Tyson Contract clearly and unambiguously requires Double H to compensate Tyson if any hedging adjustments resulting from the hedging activity result in a negative net profit.

31. Under the clear and unambiguous terms of the Tyson Contract, Double H bore the burden of the consequences of the management of market risks.

32. When each lot of cattle was placed under the Tyson Contract, Double H would provide Tyson with a breakeven calculation analysis for each lot.

33. The Court finds that Trial Exhibits 112-149 contain, among other things, the breakeven calculations provided to Tyson by Double H for the Tyson Claim Lots.

34. The breakeven calculations provided by Double H calculated what the projected sale price of the cattle would have to be, and included the procurement costs, Double H's projected grow and feeding costs as well as the interest and guaranteed profit due to Tyson, and a built-in profit for Double H.

35. The Court finds that if Double H met its breakeven projections by controlling the procurement, grow, and feed costs of the cattle, the Tyson Contract would have been profitable for Double H.

36. When each lot of cattle was placed under this agreement, Tyson hedged the sale price of the cattle based on the breakeven calculations provided by Double H. The Court finds

that each and every head of cattle placed under the Tyson Contract was appropriately hedged by Tyson at the breakeven price.

37. The purpose of hedging a lot of cattle is to protect against downturns in the final market price of the cattle, by "locking-in" the sale price of the cattle at the time they are placed. If the final market price of the cattle at the time of slaughter goes down, the supplier still gets the benefit of the locked-in price and the projected profit if costs are as projected by the supplier.

38. On the other hand, if the final market price of the cattle at the time of slaughter goes up, the supplier still gets the benefit of the locked-in price. The cost of closing out the hedge is offset by the increase in the market price. In other words, so long as the costs are controlled by the supplier so they do not exceed the projections, market fluctuation will not affect overall projected profit for the supplier.

39. During the latter part of the relationship between Tyson and Double H under the Tyson Agreement, the market price of the cattle sold at slaughter was increasing.

40. The hedged price during this same time period also increased.

41. Trial Exhibit 151 accurately depicts the hedged placement and closing price for the cattle hedged under the Tyson Contract.

42. Any difference in the hedged price ("deal price," on Exhibit 151) and closing price at the time of slaughter resulted in a "hedging adjustment." The hedging adjustment was positive if the closing price was lower than the hedged price, resulting in a hedging gain. The hedging adjustment was negative if the closing price was higher than the hedged price, resulting in a hedging loss.

43. Trial Exhibit 151 accurately depicts the hedging adjustments for each hedge that was placed for the cattle under the Tyson Contract.

44. The hedging adjustments for each hedge were calculated on a weekly basis.

45. The cattle from each of the Tyson Claim Lots were killed in multiple calendar weeks per lot.

46. Trial Exhibits 154 and 155 accurately depict the hedging adjustments per week and accurately allocate the weekly hedging adjustments to the Tyson Claim Lots.

47. Based on the hedging adjustments per lot of cattle, each of the Tyson Claim Lots had the following net profit/loss after all adjustments:

| Lot Number | Net Profit/Loss (before hedging adjustment) | Hedging Adjustment | Final Net Profit/Loss (after all adjustments) |
|---|---|---|---|
| 735 | $9,588.44 | ($60,821.27) | ($51,232.83) |
| 743 | ($1,174.23) | ($83,138.78) | ($84,313.01) |
| 745 | $2,935.93 | ($48,339.39) | ($45,403.46) |
| 751 | ($2,342.23) | ($25,461.20) | ($27,803.43) |
| 773 | ($27,156.93) | ($45,162.69) | ($72,319.62) |
| 840 | ($9,748.12) | ($26,196.36) | ($35,944.48) |
| 836 | ($14,757.71) | ($22,607.62) | ($37,365.33) |
| 791 | ($5,215.37) | ($54,509.94) | ($59,725.31) |
| 790 | ($8,249.93) | ($9,483.56) | ($17,733.49) |
| 793 | ($659.09) | ($7,755.02) | ($8,414.11) |
| 814 | $1,126.47 | ($15,658.91) | ($14,532.44) |
| 818 | $2,931.61 | ($11,027.40) | ($8,095.79) |
| 828 | ($4,031.56) | ($25,583.57) | ($29,615.13) |
| 852 | ($10,753.71) | ($43,100.02) | ($53,853.73) |
| 767 | ($21,009.00) | ($50,887.80) | ($71,896.80) |
| 777 | ($7,570.41) | ($17,021.01) | ($24,591.42) |
| 779 | ($423.99) | ($285.28) | ($709.27) |
| 783 | ($2,219.46) | ($14,556.17) | ($16,775.63) |
| 785 | ($9,838.80) | ($23,927.15) | ($33,765.95) |
| 787 | ($2,508.51) | ($7,605.89) | ($10,114.40) |
| 846 | ($8,163.82) | ($22,583.74) | ($30,747.56) |
| 753 | ($17,588.10) | ($51,342.69) | ($68,930.79) |
| 789 | ($16,370.23) | ($60,862.46) | ($77,232.69) |
| 830 | $856.59 | ($2,482.37) | ($1,625.78) |
| 850 | $1,755.09 | ($5,043.37) | ($3,288.28) |
| 799 | ($14,084.11) | $1,398.58 | ($12,685.53) |
| 795 | ($4,670.18) | $1,208.98 | ($3,461.20) |

TYSON FRESH MEATS, INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 9

Matter: 7081-002

| 797 | ($4,072.95) | ($690.32) | ($4,763.27) |
|---|---|---|---|
| 801 | ($10,951.30) | $622.12 | ($10,329.18) |
| 803 | ($6,953.35) | ($630.77) | ($7,584.12) |
| 844 | ($2,709.08) | ($1,166.76) | ($3,875.84) |
| 854 | ($4,200.18) | ($27.78) | ($4,227.96) |
| 856 | ($1,559.30) | $941.59 | ($617.71) |
| 858 | ($3,062.72) | ($3.10) | ($3,065.82) |
| 862 | $1,158.38 | $407.04 | $1,565.42 |
| 866 | ($8,311.54) | ($10.39) | ($8,321.93) |
| 860 | ($6,811.89) | ($1,640.53) | ($8,452.42) |
| 864 | ($5,363.21) | ($1,228.93) | ($6,592.14) |
| TOTALS | ($222,178.50) | ($736,263.93) | ($958,442.43) |

48. With regard to basis risk (as opposed to price risk), Double H never requested a basis contract between itself and Tyson for any of the cattle placed pursuant to the Tyson Contract.

49. Additionally, Double H never requested a fixed price contract on any of the cattle placed pursuant to the Tyson Contract.

50. Nevertheless, based on the unrefuted trial testimony of Dr. James Mintert, during the time period when the Tyson Contract was in force, there was not significant basis risk during that period. Any fluctuations in basis during that period were normal market fluctuations in basis, not something abnormal that required aggressive basis risk activity.

51. The risk management portion of the Tyson Contract allows Double H to request different hedging practices if it is unsatisfied with what Tyson is doing.

52. Throughout the time that Tyson was hedging cattle pursuant to the Tyson Contract, Tyson would send a weekly report to Double H, listing the cattle that had been hedged, and which hedges had been liquidated that week. The report was in substantially the same format as that depicted on Trial Exhibit 151 and showed the various hedge gains and losses that were being experienced.

53. The Court finds that Hollifield was sufficiently sophisticated in the various risk management options and that he could have negotiated a different type of risk management activity if he wanted something different done. However, the Court also finds that Double H never requested Tyson do anything different with regard to risk management other than hedge the cattle, even in light of the weekly reports that were being provided to Double H by Tyson, showing the results of the hedging activity.

54. The Tyson Contract required Double H to pay Tyson if the hedging adjustments were not sufficiently offset by the market price of the cattle at the time of slaughter.

55. For the Tyson Claim Lots, Double H has not paid Tyson any portion of the $958,442.43 net loss due to the hedging adjustments.

56. The parties dispute whether or not Tyson managed the market risks in a customary and reasonable manner.

57. Double H conceded at trial that the applicable standard for Tyson's conduct is what is customary and reasonable risk management activity within the entire cattle market, not simply Double H's cattle operation.

58. At trial, the Court heard testimony from two witnesses characterized as experts. The first witness who provided such testimony was Terry Hollifield. As stated at trial, the Court finds that Mr. Hollifield was qualified to testify as an expert witness as to the risk management that had previously been performed related to his own cattle operation. Mr. Hollifield was not qualified, and did not testify, as an expert in cattle risk management generally. The Court specifically finds that Mr. Hollifield's testimony as to the risk management was insufficient to support a finding as to what hedging practices are reasonable and customary in the cattle industry generally, since Hollifield's experience is limited to his own operation.

59. While the Court has no reason to doubt Hollifield's testimony as to his own hedging practices, the Court specifically finds that Mr. Hollifield was not qualified, and did not testify, as to what sort of risk management tools and techniques were customary and reasonable for the cattle industry as a whole. Mr. Hollifield's testimony was limited to his own cattle operation and therefore is not given much weight by the Court in reaching its decision herein.

60. The second expert who provided testimony was Dr. James Mintert, presented by Tyson. Dr. Mintert was qualified and testified as an expert on cattle risk management throughout the cattle industry.

61. Dr. Mintert testified regarding the various tools available for price risk management in the cattle industry, including hedging prices, purchasing put or call options, fixed-price contracts, and basis contracts. Dr. Mintert testified regarding the customary and reasonable risk management techniques used within the cattle industry. The Court specifically finds that Dr. Mintert's testimony regarding cattle risk management was credible and well-supported by his experience and investigation.

62. Based on the credible expert testimony presented at by Dr. Mintert, the Court concludes that the risk management techniques performed by Tyson in this case were customary and reasonable risk management techniques, recognized by the cattle industry as a whole. While the risk management techniques employed by Tyson (i.e., hedging the price of each head of cattle as they were placed) may be conservative, the repeated and continued use of a futures contract is a recognized customary and reasonable risk management technique. Indeed, as Dr. Mintert testified at trial, the cattle companies that tend to succeed over the long-term employ exactly the same techniques as were employed here.

63. Various other fact witnesses also testified on behalf of both Tyson and Double H. The Court specifically finds that each of these witnesses was a credible fact witness and credibly and reliably testified to facts within the scope of their own personal knowledge.

## PROPOSED CONCLUSIONS OF LAW

If a conclusion of law is, or should be, a finding of fact, such conclusion shall be deemed to also be a finding of fact.

1. This Court has jurisdiction over the parties and has subject matter jurisdiction pursuant to 11 U.S.C. §§ 105 and 503, and 28 U.S.C. §§ 157 and 1334. In addition, the parties have waived any claims that the Court lacks personal or subject matter jurisdiction over this matter.

2. The Tyson Contract was an executory contract.

3. The Tyson Contract was assumed by the Debtor after Motion and argument before the Court on or around December 27, 2010.

4. The Tyson Contract was later terminated and rejected by the Debtor on or around March 16, 2012.

5. "When a reorganizing debtor assumes an executory contract and thereafter rejects it, all of the liabilities flowing from that rejection are entitled to priority as an administrative expense of the bankruptcy estate. Under [11 USC] § 365(g)(2), the rejection of an assumed executory contract or lease constitutes a breach, and that breach is deemed to occur at the time of the rejection." *In re Widmier*, 03.4 IBCR 234, 245 (Bankr. D. Idaho, 2003).

6. In this case, the Tyson Contract terminated after Double H failed to make payments of $958,442.43 as required by the Tyson Contract.

7. At its essence, the dispute between Tyson and Double H is a breach of contract dispute.

8. In Idaho, a breach of contract claim requires the following elements: (a) the existence of a contract, (b) the breach of the contract, (c) loss causation, and (d) a specific amount of damages. *See, e.g., Mosell Equities, LLC v. Berryhill & Co., Inc.*, ___ Idaho ___, 297 P.3d 232, 241 (2013).

9. Here, the Court concludes that a contract existed between Tyson and Double H – the Tyson Contract.

10. The Court concludes that the Tyson Contract allocated risks associated with procurement, grow, and feed costs to Double H. Double H failed to control procurement, grow, and feed costs, which led to losses (to Tyson) under the Tyson Contract of $958,442.43.

11. Since the Tyson Contract allocated the risk of this type of loss to Double H, the Court further concludes that Double H breached the contract by failing to pay $958,442.43 to Tyson.

12. A party, such as Double H, may be excused from performing its obligations under a contract by the other party's own material breach of the contract. *See J.P. Stravens Planning Associates, Inc. v. City of Wallace*, 129 Idaho 542, 928 P.2d 46 (Ct. App. 1996).

13. Double H argues that it should be excused from making the required payments under the Tyson Contract because of Tyson's own failure to manage market risk in a customary and reasonable manner.

14. The Court concludes that Tyson adequately performed all of its obligations under the Tyson Contract.

15. The Court concludes that Double H is not excused from performing its own obligations under the Tyson Contract because there was no material breach by Tyson.

16. There were significant negative hedging adjustments on the Tyson Claim Lots. The Court concludes that these negative hedging adjustments were not sufficiently offset by the increased market price of cattle at the time the cattle were slaughtered.

17. Although the Court believes the losses occurred because Double H failed to adequately protect against rising procurement, feed, and grow costs of the cattle and Double H's projected breakeven calculations were inaccurate, it does not need to reach that conclusion to decide this matter. The Tyson Contract allocated this risk to Double H. Thus, the consequence of failing to properly project breakeven calculations and properly control cattle costs falls on Double H.

18. "For breach of contract the laws of damages seeks to place the aggrieved party in the same economic position he would have had if the contract had been performed." *Gilbert v. City of Caldwell*, 112 Idaho 386, 395 (Id. Ct. App., 1987).

19. Based on the total hedge adjustments, as well as all other adjustments that were made to the final net profit/loss to the cattle (such as the interest and guaranteed profit amounts), had Double H performed the contract as required it would have paid Tyson $958,442.43. The Court finds and concludes that Tyson was damaged by Double H's breach of contract in that amount – $958,442.43.

20. Double H asserted a counterclaim against Tyson based on Tyson's failure to manage the risk in a customary and reasonable manner. Because the Court has found that Tyson did, in fact, manage the price risk in a customary and reasonable manner, the Court further concludes that Double H is not entitled to any recovery on its counterclaim.

21. Additionally, the counterclaim asserted by Double H apparently seeks damages in the amount of the total hedging adjustments claimed by Tyson. In essence, then, Double H seeks an award against Tyson of the "gains" that Double H claims would have been realized had no

risk management been performed at all.  The Court specifically finds and concludes that this is not a reasonable calculation of damages.

22. Double H's damage calculations fail to take into account the lots for which Tyson already paid Double H and also fail to account for the lots that Hollifield admitted during his trial testimony were hedged in a customary and reasonable manner.  Given these failures, Double H has failed to prove any alleged damages with reasonable certainty.

23. Based on the foregoing, Tyson is entitled to an administrative claim in the Debtor's bankruptcy case in the amount of $958,442.43.  Said claim shall be paid according to the provisions of the Debtor's confirmed plan.  Double H is not entitled to any recovery on its counterclaim.

DATED this 20th day of September, 2013.

/s/  Matt Christensen
MATTHEW T. CHRISTENSEN
Attorney for Plaintiff/Counterdefendant

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20th day of September, 2013, I filed the foregoing document electronically through the CM/ECF system, which caused the following parties to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

| | |
|---|---|
| Matthew T. Christensen | mtc@angstman.com |
| Brent Taylor Robinson | btr@idlawfirm.com |
| Noah G. Hillen | ngh@moffatt.com |
| Sam Johnson | sam@treasurevalleylawyers.com |

Any others as listed on the Court's ECF Notice.

/s/ Matt Christensen
Matthew T. Christensen