# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | |
|---|---|
| In Re:<br><br>**HOLLIFIELD RANCHES, INC.**,<br><br>    Debtor. | **Bankruptcy Case No. 10-41613-JDP** |
| **TYSON FRESH MEATS, INC.**,<br><br>    Plaintiff/Counter-defendant,<br><br>vs.<br><br>**HOLLIFIELD RANCHES, INC.**,<br><br>    Defendant/Counter-plaintiff. | **Adv. Proceeding No. 12-08030-JDP** |

## MEMORANDUM OF DECISION

MEMORANDUM OF DECISION – 1

**Appearances:**

> Matthew Christensen, Angstman, Johnson & Associates, PLLC, Boise, Idaho, Attorney for Tyson Fresh Meats, Inc.

> Sam Johnson, Johnson & Monteleone, Boise, Idaho, Attorney for Hollifield Ranches, Inc.

### *Introduction*

Plaintiff Tyson Fresh Meats, Inc. ("Tyson") sued chapter 11 debtor, Defendant Hollifield Ranches, Inc. ("Hollifield"), to recover the damages its suffered as a result of Hollifield's breach of a cattle feeding contract. Hollifield, defended, and in turn, asserted a counterclaim alleging that it was Tyson that breached the parties' agreement.  In particular, Hollifield claims that Tyson failed in performing its contractual duty to manage the cattle market risks associated with the parties' agreement in a reasonable and customary manner.

The Court conducted a trial in the adversary proceeding on August 22 and 23, 2013.  The parties thereafter submitted closing arguments.  Dkt. Nos. 75, 77, 80, and 81.  This Memorandum constitutes the Court's

MEMORANDUM OF DECISION – 2

findings of fact, and conclusions of law.  Rule 7052.[1]

### *Facts*

## I.  The Contract

Prior to the commencement of Hollifield's chapter 11 case, the

parties entered into a contract entitled "Tyson Fresh Meats Cattle Feeding

Agreement with Double H Cattle Co." (the "Contract").[2] *See* Exh. 101.  The

Contract was prepared by Tyson.  Terry Hollifield, the principal owner and

operator of Hollifield, signed the Contract on behalf of the corporation on

May 28, 2010.  Brad Brandenburg, director of cattle procurement for Tyson,

signed on behalf of Tyson on June 9, 2010.  The parties do not dispute that

the Contract was, in all respects, an arm's-length commercial transaction.

Moreover, the Court finds that the parties were sophisticated in

commercial matters, and experienced in, and intimately familiar with, the

---

[1]  Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101 – 1532, and all rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001 – 9037.

[2]  Double H Cattle Co. was owned and managed by the same persons as the chapter 11 debtor-corporation.  The two corporations merged shortly before Hollifield filed its chapter 11 petition.

MEMORANDUM OF DECISION – 3

workings of the cattle industry, including the propensities of the

marketplace for such commodities.

The Contract obligated Hollifield to locate and purchase cattle for

placement into a Tyson grower program it referred to as the "Pioneer

Model."  Under this arrangement, when Hollifield identified acceptable

cattle, Tyson would advance funds to, or reimburse Hollifield for, the

purchase of the cattle, which would be kept and cared for at Hollifield's

facilities.  Tyson would then pay Hollifield all amounts required to fund

the "grow" and feed expenses incurred in fattening the cattle, although

Tyson would charge Hollifield agreed interest on the amounts so

advanced.  Hollifield's primary responsibility under the Contract was to

select the particular cattle, and to feed and care for them until they reached

an "acceptable finished weight[,] and [to deliver them to Tyson's] Pasco,

W[ashington] Plant for slaughter."  Exh. 101 at 1.  As consideration for its

participation in this arrangement, Hollifield guaranteed that Tyson would

receive a fifteen dollar profit per head.

Tyson provided Hollifield periodic and regular reports concerning

MEMORANDUM OF DECISION – 4

the expenses being incurred for the groups or "lots" of cattle placed in the

program, and when the animals were delivered by Hollifield to Tyson,

Tyson provided Hollifield with a final accounting the parties used to

determine their entitlements and liabilities as to each lot. Included in the

final accounting were Tyson's calculations for the amount of profit or loss

incurred on each lot due to the risk management measures employed by

Tyson using a technique known as a "hedge."[3]  Indeed, the Contract

contains two examples of these calculations under two typical scenarios:

---

[3] A "hedge" is a common risk management technique, which consists of
purchasing or selling a futures contract on a national exchange in order to guard
against the risk of loss due to changing prices for livestock on the cash market. A
futures contract is an agreement to buy or sell livestock at a date in the future.
There are two types of hedges. A "short hedge," also known as a selling hedge,
is used to protect against falling prices. In this case, a short hedge would lock in
the price for the cattle on the day the futures contract is made, and thus protect
against the risk of a downturn in the actual cash market for the cattle when they
are sent to market. A short hedge is used by a producer of the livestock. On the
other side of the coin is the "long hedge," also known as a purchasing hedge. A
long hedge is used to protect against rising prices, and is employed by the
processor of the cattle. The use of hedges can be supplemented by other, active
risk management tools, known as options, which are discussed below. For a
general discussion of common risk management terminology and techniques, *see*
CME Group, Self-Study Guide to Hedging with Livestock Futures and Options,
(Jan. 2013), *available at,*
http://www.cmegroup.com/trading/agricultural/files/AC-215_SelfStuy_GuideNY
MEX.pdf

MEMORANDUM OF DECISION – 5

**Example 1**

| Head in Lot: | 500 |
|---|---|
| Gross Market Value | $588,000 |
| Less: Freight | ($1,500) |
| Less: Beef Council | ($500) |
| Hedge Gain/(Loss) | $10,000 |
| Less: Cattle and Grow Costs | ($570,000) (includes [Tyson's] interest cost) |
| Net Lot Profit/(Loss) | $26,000 |
| Profit/Loss [per head] | $52.00 |
| [Tyson] Fixed Return [per head] | [(]$15.00[)] |
| Settlement | $37.00/Head or $18,500 |

**Example 2**

| Head in Lot: | 500 |
|---|---|
| Gross Market Value | $588,000 |
| Less: Freight | ($1,500) |
| Less: Beef Council | ($500) |
| Hedge Gain/(Loss) | ($10,000) |
| Less: Cattle and Grow Costs | ($590,000) (includes [Tyson's] interest cost) |

MEMORANDUM OF DECISION – 6

| Net Lot Profit/(Loss) | ($14,000) |
| Profit/Loss [per head] | ($28.00) |
| [Tyson] Fixed Return [per head] | [(]$15.00[)] |
| Settlement | ($43.00)/Head or ($21,500) |

Exh. 101 at 2-3.  As can be seen, if the purchase and sale prices, and the

grow costs incurred concerning a particular lot of cattle under the Contract,

are similar to those in Example 1, the result is that Tyson owes money to

Hollifield.  Example 2 reflects a situation where, after the accounting,

Hollifield is obligated to pay Tyson.

Even though the profitability of this venture, for Hollifield, could be

dramatically affected by the risk management techniques employed, the

Contract calls for the risk management to be solely Tyson's responsibility.

The relevant paragraph of the Contract provides:

**Risk Management**

[Tyson] will be responsible for management of market
risks through the reasonable and customary use of
hedging practices on the cattle placed for feeding under
this agreement, except in the event [Hollifield] requests

MEMORANDUM OF DECISION – 7

different hedging practices, at which time the parties shall mutually agree as to what hedging practices to undertake hereunder. The gain/loss resulting from this hedging activity will be included in [the] settlement between [Hollifield] and [Tyson] for each lot of cattle. In the event cattle are delivered from multiple lots in any given week, the hedge revenue or cost will be allocated to each lot on a dollars per head basis.

Exh. 101 at 2.

The risk management provision in the Contract was expressly negotiated by the parties. Hollifield had initially sought out contract opportunities with Tyson. Based upon his expressed interest, in February 2010, Mr. Brandenburg and another Tyson representative, Larry Roberts, met with Mr. Hollifield at the Boise airport. After discussing Hollifield's interest in participation in the Pioneer Model program, at that meeting, Mr. Brandenburg specifically quizzed Mr. Hollifield concerning whether he would want to be responsible for performing any necessary risk management to protect Hollifield during its participation in the program. In response, Mr. Hollifield made it clear that he wanted Tyson to be solely responsible for the risk management decisions under the Contract because

MEMORANDUM OF DECISION – 8

he did not want the distraction of having to manage the risk, and because

he wanted Tyson's "people" to make those decisions.

The parties dispute whether the Tyson representatives disclosed to

Mr. Hollifield at the meeting that Tyson's risk management strategies

under the Pioneer Model were to be conservative, and that the only risk

management technique Tyson would employ was the purchase of short

hedges for cattle enrolled in the program. Mr. Hollifield alleges that this

was not disclosed to him. Tyson contends that, through the statements of

its agents, Mr. Hollifield was indeed told about Tyson's approach to risk

management practices, and that, as an alternative to Tyson's methods, Mr.

Hollifield was offered the option of managing his own risk under the

Contract. The Court finds the testimony of Mr. Brandenburg on this topic

was cogent and convincing, and represents a more complete account of the

parties' meeting at the airport. The Court finds, as a matter of disputed

fact, that Mr. Hollifield was told that Tyson would use only short hedges

on each lot of cattle placed in the program, and despite such knowledge,

that Mr. Hollifield elected to delegate risk management solely to Tyson.

MEMORANDUM OF DECISION – 9

**II. The Parties' Performance Under the Contract and the Fallout.**

Having reached their deal and executed the Contract, Hollifield

began the process of identifying cattle for placement in the Tyson program,

some of which were his own cattle, and others acquired from third parties.

As cattle were purchased by Hollifield for Tyson under the Contract, Mr.

Hollifield would submit a form to Tyson containing his calculations of the

expected grow costs for the cattle, and his projections of income to be

received from the cattle at slaughter.  In particular, these reports identified

what Mr. Hollifield estimated were to be the "breakeven" calculations for

each lot of cattle, or in other words, his projections of the necessary income

at sale required to pay for his estimated costs of acquiring and growing

that lot of cattle, along with a built-in profit for Hollifield.  This calculation

was a significant one, since one of the ways that Hollifield profited from

this enterprise was based on its ability to meet its expense projections.

Exhibits 112-149 contain, among other information, the breakeven

calculations provided to Tyson by Hollifield for the lots of cattle enrolled in

the program.

MEMORANDUM OF DECISION – 10

The reports submitted to Tyson were also important for another reason. When they were received, Tyson would use the information in them to place a short hedge on the cattle in that particular lot that would, effectively, lock in a return to the parties at or above the breakeven point provided by Hollifield. Thus, in theory, by using this technique, whether the market price for the finished cattle went up or down in relation to the acquisition price and grow costs, if Hollifield met its breakeven grow cost projections, it would make a profit on each particular lot under the Contract. If the market price for cattle declined prior to slaughter, the hedge protected the parties. But, of course, if Hollifield could not meet the breakeven projections, and if the market price for cattle increased, because of the short hedge, Hollifield stood to lose money on the arrangement.

During its course of performance under the Contract, Hollifield enrolled, grew, and delivered to Tyson, over 12,000 head of cattle, divided into lots. *See* Exhibit 204. While Hollifield's participation in the program was, for a time, profitable, the market price for cattle later began to move. Because of this, Tyson alleged that several lots of the cattle enrolled in the

MEMORANDUM OF DECISION – 11

program and eventually delivered by Hollifield to Tyson resulted in a loss for Hollifield under the terms of the Contract. More precisely, as detailed in Exhibit 157, and using the calculations required by the Contract, Tyson alleges that Hollifield owes Tyson a total of $958,442.43.

Hollifield does not dispute the accuracy of the Tyson's calculations in Exhibit 157. However, Hollifield alleges that it suffered unnecessary losses under the Contract because Tyson breached it duty to perform proper risk management. Hollifield therefore asserts it is not indebted to Tyson, and indeed, that Tyson owes Hollifield breach of contract damages for losses its suffered as a result of its inadequate risk management decisions.

More precisely, during the term of the Contract, the market price for cattle generally increased, indeed, during some periods, precipitously. During this time, as he received Tyson's weekly reports of activities on its accounts, Mr. Hollifield noticed that Hollifield was incurring consistent losses as the combined result of these market shifts and the short hedges placed on the cattle by Tyson. *See, e.g.*, Exh. 151. Mr. Hollifield testified

MEMORANDUM OF DECISION – 12

that he contacted Mr. Brandenburg via telephone in January 2011 to report

his concern on at least one occasion.  Mr. Hollifield testified that in this

conversation he asked Mr. Brandenburg if Tyson was doing risk

management as required under the Contract.  Mr. Hollifield apparently

made it clear to Mr. Brandenburg that he was not happy with Tyson's

decision to use only short hedges to manage risk, especially in the face of a

rising cattle market.  Mr. Brandenburg's reaction to Mr. Hollifield's

concern was to offer, if Mr. Hollifield so chose, to "pick up" the cattle from

Hollifield, and as the Court understands this remark, to effectively

terminate the parties' relationship.  Importantly, however, it is undisputed

that Mr. Hollifield never requested, orally or in writing, that Tyson use

other risk management techniques.  Mr. Hollifield also did not elect to end

Hollifield's participation under the Contract.

### III.  Hollifield's Bankruptcy Case and this Adversary Proceeding.

On September 9, 2010, Hollifield filed a chapter 11 petition.  Bankr.

No. 10-41613-JDP, Dkt. No. 1.  On December 27, 2010, at the joint request of

Hollifield and Tyson, the Court approved Hollifield's assumption of the

MEMORANDUM OF DECISION – 13

Contract as an executory contract.  Bankr. Dkt. No. 158.  Later, when the

parties' relationship disintegrated, Hollifield and Tyson jointly moved to

reject the Contract, a motion the Court granted on March 16, 2012.  Bankr.

Dkt. No. 451.[4]

Tyson filed a complaint against Hollifield commencing this

adversary proceeding on March 9, 2012.  Adv. No. 12-08030-JDP, Dkt. No.

---

[4] Section 365(a) of the Bankruptcy Code allows a chapter 11 debtor to assume or reject pre-bankruptcy executory contracts.  Because it allows a reorganizing debtor the option of abandoning its participation in a burdensome or ill-advised contract, it can significantly assist a debtor in reorganizing its financial affairs.  *Wolkowitz v. Fed. Deposit Ins. Corp. (In re Imperial Credit Industries, Inc.)*, 527 F.3d 959, 975 (9th Cir. 2008).  However, the Code provision also allows debtors with favorable contracts to preserve their benefits, despite the bankruptcy filing, provided the debtor persuades the Court that contract assumption represents the exercise of good business judgment by the debtor.  *Agarwal v. Ponoma Valley Med. Grp., Inc. (In re Ponoma Valley Med. Grp., Inc)*, 476 F.3d 665, 670 (9th Cir. 2007).  The debtor's decision to assume a contract is not without risk, though.  If an executory contract is initially rejected by the debtor, the other party's contract damages constitute a nonpriority, unsecured claim.  *In re Imperial Credit Industries, Inc.*, 527 F.3d at 975.  If, instead, an executory contract is assumed, but then later breached by the debtor, the resulting damage claim in favor of the other party to the contract is entitled to priority in the bankruptcy case.  *Id.*  Absent consent to some other treatment, the holders of priority claims are entitled to full payment under a chapter 11 plan.  § 1129(a)(9).  Indeed, Hollifield's confirmed chapter 11 plan contains such a provision.  *See*, n.5, *infra.*  Thus, as in this case, the breach of an assumed executory contract, may spawn a significant, perhaps even prohibitive, priority claim, jeopardizing a debtor's ability to reorganize.

MEMORANDUM OF DECISION – 14

1.  It alleged that Hollifield had breached the Contract, and requested that the Court determine the amount of its damages, and that it declare the award to Tyson constitutes an administrative expense payable in full under the terms of Hollifield's confirmed chapter 11 plan.[5]

Hollifield filed a counterclaim alleging that Tyson had breached the Contract based upon its failure to properly manage the risk of the cattle market as required by the agreement.  Adv. Dkt. No. 6.  Due to Tyson's breach, Hollifield argued it was excused from performance of the Contract, and that it did not owe Tyson any amounts.  Further, Hollifield claimed it was entitled to recover substantial money damages from Tyson.[6]

---

[5]  Hollifield's Sixth Amended Chapter 11 Plan was confirmed by the Court on September 5, 2012.  Bankr. Dkt. No. 594.  The plan acknowledged the pendency of this adversary proceeding, and provided for an outcome in either Tyson's or Hollifield's favor.  In particular, the plan conceded that any judgment for damages rendered by this Court against Hollifield in this adversary proceeding would constitute an administrative expense priority, and provided that "if the Court allows an administrative claim in favor of [Tyson], such claim shall be paid over a period of three years in six semiannual payments . . . ." Bankr. No. 10-41613, Dkt. No. 562.

[6]  The amount of Hollifield's damages based on Tyson's alleged breach of the Contract has been something of a moving target.  In its original counterclaim, Hollifield sought $1,200,000.  Over time, that number has changed, increasing to an estimate of $1,400,000 in the confirmed plan.  In its last salvo, in the final

MEMORANDUM OF DECISION – 15

At the trial, the parties focused their presentations on whether

Tyson's use of only short hedges for risk management was "reasonable

and customary" as required by the Contract.  On this topic, Tyson offered

the testimony of Dwight Bibbs, Tyson's Vice President of Risk

Management and Procurement, the person charged with placing the

hedges, to explain Tyson's approach to risk management in this case.  Mr.

Bibbs, Tyson's experienced risk manager, testified that after a short hedge

was placed on a lot of cattle enrolled in the program by Hollifield, Tyson's

practice was not to continually monitor the hedge.  He stated that Tyson

would only receive notice of the outcome of the hedge upon the sale of the

cattle.  As to whether this approach to risk management was the

"reasonable and customary use of hedging practices," the Court heard the

opinions of two other witnesses.

---

paragraph of its post-trial rebuttal brief, Hollifield's approach to calculating its
damages is less than clear:  "[I]f we subtract out the costs of a $2.50 put,
Hollifield has sustained damages in the amount of $142,029.70, for a $3.00 put
damages equal $113,608.45, and a $4.00 put damages equal $56,765.95 . . .
Hollifield has sustained damages ranging from $313,547.10 to $56,765.95."  Adv.
Dkt. No. 81 at 11.  Based upon the Court's decision, it is unnecessary for the
Court to evaluate these perplexing calculations.

MEMORANDUM OF DECISION – 16

First, Mr. Hollifield, a long-time cattleman, opined that Tyson's

approach to risk management was sub-par based upon his own significant

experience in managing risk in the cattle marketplace for his own

operations.  Instead of using only short hedges, Mr. Hollifield believed that

reason and prudence required Tyson to also purchase "options"[7] for cattle

enrolled in the program, especially considering that cattle prices in the cash

market were increasing dramatically during the latter half of parties'

dealings under the Contract.  Mr. Hollifield admitted, however, that he did

not ask Tyson to purchase any such options on the Hollifield cattle lots.

Tyson presented an expert, Dr. James Mintert, to testify about this

issue.  Dr. Mintert's credentials are impressive, and his testimony was

logical and persuasive.  As someone who both teaches agribusiness risk

management at a large university, and who has been personally involved

in cattle enterprises, Dr. Mintert's education, background and experience

---

[7] In this context, "options" are a right, but not an obligation, to buy or sell
a futures contract.  There are two different types of options: puts and calls.  For a
sometimes high price, these options allow a party that placed a hedge to further
manage the risk of changes in the cash price market.

MEMORANDUM OF DECISION – 17

in studying, writing about, and actually engaging in risk management in

the cattle market nationwide was substantial and impressive.  Dr. Mintert

offered his expert opinion that, under these facts, Tyson employed

reasonable and customary risk management by placing short hedges on all

of the cattle placed into the program.

In particular, although Dr. Mintert acknowledged that options could

have been employed by Tyson in tandem with the short hedges, he pointed

out that options were expensive to purchase, and Hollifield would be

required to pay that cost under the Contract.  In addition, based upon his

review of the cattle market during the pendency of the Contract, he opined

that there would not likely have been any significant benefit to Hollifield

had options been purchased.  Dr. Mintert testified that, as Tyson did with

the Hollifield cattle, using only short hedges was a justifiable, conservative

approach to risk management, that it was the same course employed by

many cattle companies that he was aware of under similar circumstances,

and that many of those companies had succeeded in the market over the

long-term employing such technique.  Dr. Mintert stated that, in his expert

MEMORANDUM OF DECISION – 18

opinion, Tyson had employed a risk management technique that was both

reasonable and customary in its dealings with Hollifield.

### Analysis and Disposition

## I. Applicable Law

Familiar Idaho legal principles control the outcome in this case.[8]

"A contract must be interpreted according to the plain meaning of

the words used if the language is clear and unambiguous." *Hill v. Am.*

*Family Mut. Ins. Co.*, 249 P.3d 812, 815 (Idaho 2011). In interpreting a

contract, a court must construe it "to give effect to the intention of the

parties," *Wing v. Martin*, 688 P.2d 1172, 1178 (Idaho 1984), and "must

consider it as a whole and give meaning to all provisions of the writing to

the extent possible." *Idaho Power Co. v. Cogeneration*, 9 P.3d 1204, 1214

(Idaho 2000). "If, however, the contract is determined to be ambiguous, the

interpretation of the document is a question of fact which focuses upon the

intent of the parties." *McKay v. Boise Project Bd. of Control*, 111 P.3d 148, 156

---

[8] Both parties cite the Court to Idaho law, and the Court agrees that Idaho
law governs in this case.

MEMORANDUM OF DECISION – 19

(Idaho 2005) (quoting *Albee v. Judy*, 31 P.3d 248, 252 (Idaho 2001)) (internal

quotations omitted).  A contract is ambiguous if it is "reasonably subject to

conflicting interpretation." *McKay*, 31 P.3d at 156 (quoting *Bondy v. Levy*,

829 P.2d 1342, 1345 (Idaho 1992)).

      In order to establish a claim for breach of contract, the plaintiff must

prove "(a) the existence of a contract, (b) breach of the contract, (c) the

breach caused damages, and (d) the amount of those damages." *Mosell*

*Equities, LLC v. Berryhill & Co., Inc.*, 297 P.3d 232, 241 (Idaho 2013) (citing

*O'Dell v. Basabe*, 810 P.2d 1082, 1099 (Idaho 1991)).  A breach of contract

may be a material breach, also known as total breach, or a partial breach.

*Enterprise, Inc. v. Nampa City*, 536 P.2d 729, 735 (Idaho 1975).  A material

breach of contract occurs as the result of "'a non-performance of [a] duty

that is so material and important as to justify the [non-breaching party] in

regarding the whole transaction as at an end.'" *Id.* (quoting 4 CORBIN ON

CONTRACTS § 946 at 809 (1951)).  Put simply, a material breach is one that

violates the "fundamental purpose" of the contract and excuses the non-

breaching party from performing under the contract.  *J.P. Stravens Planning*

MEMORANDUM OF DECISION – 20

*Assocs., Inc. v. City of Wallace*, 928 P.2d 46, 49 (Idaho Ct. App. 1996); *see also*

*State v. Chacon*, 198 P.3d 749, 752 (Idaho Ct. App. 2008) ("If a breach of

contract is material, the other party's performance is excused.").

## II.  Application of the Law to the Facts

### A.  Interpretation of the Contract

There is no dispute that a contract existed between Tyson and

Hollifield, and that Exhibit 101 is a true and correct copy of the Contract.

In this case, the parties dispute the meaning of the Contract, and indeed

focus on a single sentence:

> [Tyson] will be responsible for management of market
> risks through the reasonable and customary use of
> hedging practices on the cattle placed for feeding under
> this agreement, except in the event [Hollifield] requests
> different hedging practices, at which time the parties shall
> mutually agree as to what hedging practices to undertake
> hereunder.

Ech. 101 at 2.

Although the risk management provision of the Contract could have

been more artfully drafted, the Court finds it is not ambiguous, and that

the Contract's plain language must be enforced.  Considering the Contract

MEMORANDUM OF DECISION – 21

as a whole, and endeavoring to assign the words used the effect the parties

intended, the Court concludes this provision was meant by the parties to

task Tyson with sole responsibility for management of the market risks

attendant to the parties' cattle transactions, which duty would be satisfied

by Tyson's employment of "reasonable and customary" hedging practices.

The terms of the Contract selected for use by the parties in the

Contract should be given their ordinary meaning.  "Reasonable" should be

understood to refer to practices that are "fair, proper, or moderate under

the circumstances."  BLACK'S LAW DICTIONARY 1379 (9th ed. 2009).  When

used in a contract, the term "reasonable" is understood to be an

unambiguous reference to an objective industry or market standard.  *See*

*Ergon-West Virginia, Inc. v. Dynegy Mktg. & Trade*, 706 F.3d 419, 425 (5th Cir.

2013) ("The word 'reasonable' is not ambiguous.  When it modifies other

terms in a contract—reasonable time, reasonable value—it is used by the

parties to designate that specific time, value, or dispatch that would be

thought satisfactory to the offeror by a reasonable man in the position of

the offeree . . . [it] is a question of fact that must be answered by looking to

MEMORANDUM OF DECISION – 22

the circumstances of the case, including the nature of the proposed

contract, the purposes of the parties, the course of dealings between them,

and any relevant usage of trade.") (quotation marks and citations omitted);

*see also Missouri v. Jenkins by Agyei*, 491 U.S. 274, 286 (1989) (addressing

what is a "reasonable" attorney fee, stating "we have consistently looked to

the marketplace as our guide to what is 'reasonable.'"); *Lickley v. Max*

*Herbold, Inc.*, 984 P.2d 697, 700-01 (Idaho 1999) (applying the open market

rate for potatoes to supply the "reasonable" price left out of the contract by

the parties to the agreement); *D.R. Curtis, Co. v. Matthews*, 653 P.2d 1188,

1191 (Idaho Ct. App. 1982) (looking to the wheat market price at the time

of contracting to supply a "reasonable" price for the parties' contract that

failed to set a price).  Similarly, "customary" in this context refers to the

"custom and usage" in the industry, and is understood to mean the

"[g]eneral rules and practices that have become the norm through

unvarying habit and common use."  BLACK'S LAW DICTIONARY 442 (9th ed.

2009); *see also Nordstrom v. Diamond Int'l Corp.*, 710 P.2d 628, 631 (Idaho Ct.

App. 1985) (noting the general rule that "the custom and practice of a trade

MEMORANDUM OF DECISION – 23

become part of a contract between parties within that trade having

knowledge of the custom, unless the contrary appears [in the contract].").

Importantly, regardless of Tyson's decisions about risk management, if

Hollifield so requested during the pendency of the Contract, the parties

were obliged to "mutually agree" to the use of different hedging practices.

     Hollifield argues that the risk management provision of the Contract

is ambiguous, and in interpreting its terms, the Court must construe its

terms against the drafter—Tyson. Hollifield cites the Court to *Jensen v.*

*Seigel Mobile Homes Grp.*, 668 P.2d 65, 72 (1983) for this proposition. Under

its reading of the risk management provision, Hollifield could "request

different hedging practices" only if it wanted Tyson to employ practices

that were *not* reasonable and *not* customary. This explains why, Mr.

Hollifield insists, he never requested that Tyson use different risk

management practices, like options, and why, despite never having asked

Tyson to change its practices, Hollifield bears no responsibility for any

resulting losses.

     Hollifield's interpretation of the relevant provisions of the Contract

MEMORANDUM OF DECISION – 24

is too strained to accept.  Hollifield's reading assumes that the purpose of

this provision in the Contract is, in effect, to allow Hollifield to gamble its

potential for profits through use of nontraditional (*i.e.* unreasonable or

non-customary) risk management methods.  This reading further assumes

that Hollifield and Tyson would be able to "mutually agree" to Hollifield's

wagers, without explaining why it would ever be in Tyson's interest to do

so.  Because this scenario is so doubtful, Hollifield's efforts to create an

ambiguity in the Contract where none otherwise exists is unpersuasive.

Put another way, the Court declines to construe the Contract solely to

enable Hollifield to enhance its risk of loss.[9]

The Court concludes that the risk management provision of the

Contract at issue here is not "reasonably subject to conflicting

interpretation," and therefore, the Court must give ordinary meaning to

---

[9] According to the testimony of the witnesses at trial, the only
unreasonable and non-customary hedging practice that the parties could conjure
up for use in this setting would be a so-called "Texas hedge," referring to a
situation in which Hollifield would buy live cattle future contracts even though it
already owns cattle, a technique that would invariably increase, not reduce, risk.
It defies logic that the parties would expressly contract to allow Hollifield to act
foolishly.

MEMORANDUM OF DECISION – 25

the plain language of the Contract.[10]

B.  Breach of the Contract

Employing a plain meaning approach to interpreting the Contract,
the Court must now determine whether either party breached the Contract;
whether that breach caused damages; and the amount of those damages.
*Mosell Equities, LLC,* 297 P.3d at 241.

Tyson argues that Hollifield breached the Contract, and it is entitled
to recover $958,442.43 in damages, as calculated in Exhibit 157.  As noted
above, there is no dispute that a contract was formed, nor is there any
dispute about of the amount Tyson may recover due to Hollifield's non-
payment.  However, Hollifield argues that it is excused from performing
under the Contract, and thus paying the sum it admits would otherwise be

---

[10]  Even if this Court accepts Hollifield's invitation to find ambiguity in the
Contract provision, the Court would find, as a matter of fact, that the parties'
intention in this provision was to allow Hollifield to request that Tyson use other
hedging practices if it was dissatisfied with Tyson's selection from available
"reasonable and customary" hedging practices.   Hollifield's argument that the
intention of the parties in this provision was to allow Hollifield to wager the use
of unreasonable or non-customary hedging practices is unsupported by the
evidence and testimony submitted at trial.

MEMORANDUM OF DECISION – 26

due, because Tyson breached its duty under the Contract to manage "market risks through the reasonable and customary use of hedging practices," as the Contract provides.

On this record, and in particular, based upon Dr. Mintert's expert opinion that Tyson's use of only a short hedge in this setting was consistent with reasonable and customary hedging practices in the cattle industry, the Court concludes Tyson fulfilled its contractual obligations to manage the cattle market risks and therefore Tyson did not breach the Contract. Dr. Mintert explained that, although the exclusive use of short hedges by Tyson was indeed "conservative," its strategy was reasonable under these facts, and a course that is customary in the cattle industry. This conclusion makes sense to the Court. After all, at his request, Tyson was managing risk for Hollifield, so the use of conservative techniques would seem appropriate.

Mr. Hollifield's testimony on this subject, although indicative of his own risk management philosophies, did not address what risk management techniques should be regarded as "reasonable and

MEMORANDUM OF DECISION – 27

customary" in the industry as a whole.

In short, Hollifield's evidence and testimony fails to show Tyson

breached the Contract in its hedging practices.  In addition, while the

Court greatly respects Mr. Hollifield's personal experience in his own

ventures, the proof did not demonstrate that his standards for appropriate

risk management represent industry standards.

### Conclusion

In sum, Hollifield breached the Contract, and according to its terms,

Hollifield is indebted to Tyson.  Hollifield's counter-claim fails because

Hollifield did not prove that Tyson failed to employ reasonable and

customary risk management practices.

The Court concludes that Tyson is entitled to a judgment against

Hollifield for $958,442.43, which sum is deemed to constitute an allowed

administrative expense for purposes of § 503(b) and payment under

Hollifield's confirmed chapter 11 plan.  Counsel for Tyson shall submit an

appropriate form of judgment consistent with this Memorandum.  Counsel

for Hollifield will approve the form of the judgment.

MEMORANDUM OF DECISION – 28

Dated:  November 7, 2013

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge

MEMORANDUM OF DECISION – 29